Good morning everyone. Welcome. Our first case for argument this morning is Catherine Knowlton v. the City of Wauwatosa. Good morning, your honors. Good morning, counsel. May it please the court, my name is Kimberly Motley and I represent Catherine Knowlton, Tracy Cole, and the appellants in this matter. Respectfully, I would ask the court to reserve three minutes of my time for rebuttal. My intention today is to use this time to highlight three issues. First, I'd like to discuss how the court erred in granting summary judgment. Second, I'd like to discuss how the court abuses discretion when it misguided the jurors by misstating the legal definition of personal information pursuant to the Driver's Privacy Protection Act, and this error prejudiced my clients. And finally, I'd like to discuss how the court erred in granting the defendant's motion to dismiss. In February 2nd—Ms. Motley, before you go too far, on the summary judgment ruling, you are only appealing the district court's ruling on the First Amendment issue, correct? Not the Title VII or the malicious prosecution? That's correct. Okay, thank you, no problem. On February 2nd of 2020, 17-year-old Alvin Cole was shot and killed by Wauwatosa police officer Joseph Mensah. Joseph Mensah is the only Wauwatosa police officer who had shot and killed anyone within the last 20 years of Wauwatosa Police Department's history. And in his first five years of working as a Wauwatosa police officer, he killed three males of color, including Alvin Cole. As a result of this, Tracy Cole, the mother of Alvin Cole, as well as others in the community, were peacefully protesting in the city of Wauwatosa. And because of that peaceful protesting, they were targeted for their message. Now, this case is not about police versus protesting. This case is about how the mayor of Wauwatosa, despite the absence of any imminent dangers, implemented an emergency curfew that was citywide for five days in the city of Wauwatosa. Now, when reviewing whether or not a curfew or whether or not there's restrictions on speech, the first step of the war test is determining whether the restriction is content-based or content-neutral. And part of that analysis basically requires looking at the face of the document, as well as looking at whether the government adopted the regulation of speech because of disagreement with the message that it conveyed. The lower court only analyzed whether or not the face of the curfew was content-neutral. Have you waived that issue by waiting until your reply brief to raise it for the first time? I don't believe so, Your Honor. How? Because it wasn't in, at least I didn't see it in the blue brief, the opening brief. And generally, issues raised for the first time in reply are waived. So why wouldn't it be waived here? I don't believe it was, Your Honor, because in the lower court, when we talked with the lower court, we did put it in the summary judgment argument in response to the defendant's summary judgment argument. So it's your position that'll preserve it for appeal, even when you don't raise it in your initial opening brief? I believe that in our reply, because we did reply to the defendants that we did not waive that issue. And it's something that the court did not address in their analysis. What the court relied on is the court relied on another decision that was given in Bradkey v. Wauwatosa in which the same curfew was challenged. However, in that court's analysis, they also, that court also did not discuss whether or not the policymaker implemented the curfew because he disagreed with the message. It only looked at the face of the curfew. This court only looked at the intent of Weber, who is the chief of police for the city of Wauwatosa, and he was not the chief policymaker. She provided no analysis in terms of the intention of the mayor in implementing this curfew in Wauwatosa. And there were some critical things that it was important for the court to analyze with regards to Mr. McBride's intention in making this curfew. Secondly, in looking at the war test, the court needs to look at whether the restrictions were narrowly tailored to serve a significant government interest. And a timeline of how things progress with this curfew are really critical to understanding this analysis. With regards to the mayor of Wauwatosa, when he started implementing this curfew, he started it in July of 2020. And part of his... Well, he started planning the curfew then, and it seems like it's prudent, isn't it, for government officials to plan ahead and plan for contingencies? And so why isn't that exactly what the mayor was doing? Your Honor, I would agree with you that it is prudent for a government to plan for contingencies, and we conceded that, that a government has the right to plan for a curfew. However, the implementation of the curfew was absent any imminent dangers or any emergencies that were happening in the city of Wauwatosa. Well, how imminent must the dangers be? We're talking about a situation where, as I understand it, there were some protests during the summer that resulted in some disturbances to businesses. And then throughout the rest of the summer, we have the incidents in Kenosha, which is pretty close. How much more do you need? Does the mayor have to wait until the protesters become violent or break the law, or can he plan ahead? What is your test for how imminent it must be? Well, Your Honor, that's a very interesting question. And just to note for the record that every single case that's cited by myself, as well as my colleague, regarding a protest and regarding a curfew, that was in response to an emergency. Now, certainly in August 23rd of 2020, there was a protest that happened in Kenosha, and there was property damage and thus and so. And as a result of that, there was an emergency curfew that was implemented in Kenosha. So they were responding to civil arrest. They were responding to rioting. Is it your position that in order to put a curfew in, there has to actually be violence ongoing? Because isn't the public safety interest to prevent public harm in the first place? Absolutely, Your Honor. So then why would the test be, you have to wait until that harm is actually occurring before you put a curfew in place? Well, Your Honor, on the second test, the war test, the court needs to, and this is according to the standard, that a municipality cannot implement a curfew based off of mere conjecture. But that's different than what we have here. And I think Judge Lee was asking questions along this line, too. Is it your position that in order to impose a curfew, there actually has to be ongoing violence? No, that is not my position. Okay. So what is the trigger then, from your standpoint, in order to impose a curfew that would prevent public harm and keep the public safe? My standard falls along the lines of Ward's standard, which is in order to evaluate whether a curfew is legally valid, and we're looking at the restrictions that are being imposed on a community, you need to look at whether there's a good faith basis by the person that's implemented the curfew. In this case, there was not a good faith basis by the mayor. And why wouldn't the fact that there had been property damage and some disruptions in the town already, and that a very similar factual scenario had just occurred in Kenosha, which isn't that far away, where the prosecutors had announced a prosecuting decision about an officer who had killed individuals, and there was a lot of disruption from that property damage, people harmed, places harmed. Why isn't that sufficient to trigger it? Well, Your Honor, I would respectfully disagree that there was a lot of civil unrest that was happening in Wauwatosa. The record is completely devoid of that. There is no evidence in the record that there was property damage, that there was... There was evidence that there was some property damage. I don't believe that there is. I would respectfully disagree with that. And in fact, the civil unrest and peaceful protesting, which is what was happening in Wauwatosa. And in looking whether or not this protest should have, or this curfew should have been implemented, you need to look at why did the mayor of Wauwatosa, if there was all this civil unrest, if there was all this issues that were happening in Wauwatosa, then why did the mayor hide the planning of the protest from the other common council members for three months? He started planning for this curfew in July of 2020. This curfew was not implemented until October of 2020. And between that time period... So how do you get... I want to go back to the factual question. I'm looking at McBride's deposition where he was describing some of the civil unrest that was going on, that people were shutting down businesses, pushing people, driving on neighbor's lawns, trashing store windows and windows to the police and the fire commissioner. I could go on and on, but I don't see any evidence refuting that deposition testimony. And that, to me, looks like there is some civil unrest going on. Your Honor, we asked in our discovery demands for any evidence of any credible or serious threats, and we got pushback because it was objected to what are credible and serious threats, and we're told they had no documents. So I understand... So how do you get around this deposition testimony? Well, how I get around that is that if there was all these issues that were happening in Wauwatosa, then why did the mayor keep it a secret from his own government? He indicated if that was happening, then why wasn't there a curfew that happened in the summer of Wauwatosa? Why did this curfew take three months to plan in the fall? You're leaving out a very important contextual fact here, and that is that the curfew is key to the district attorney's announcement that there would be no prosecution of the officer, of Officer Mensah. And that was going to be a trigger point for protest activity. And so it was responsive to that public safety concern, not just the general condition of unrest that was pervasive during the summer of 2020 in response to a series of officer-involved killings and shootings that had produced all kinds of protests all over the country and raised concerns that came to fruition in Wauwatosa with an officer-involved shooting. And the expectation was that there would be a reaction to the district attorney's announcement on October 7th. And the curfew was responsive to that specific concern, not just general unrest. Well, Your Honor, then why hide it from your local governing body? Why not have them involved in the planning? This is an objective test. So it doesn't really matter what the mayor was doing and whether he was concealing it from anybody. It's an objective test about whether the governmental interest is strong enough to justify what the mayor did in response. It's just a means and fit kind of justification. It was a limited curfew for the evening and overnight hours. There was ample opportunity for protesters to be in the streets of Wauwatosa protesting during the day. So this seems easily to satisfy the ward test. Your Honor, I would respectfully disagree with that. And in comparing this curfew with what's happened in Wauwatosa, there is a narrowly tailoring element of the ward test in whether the restrictions, they're giving too many restrictions in the curfew. Even in Kenosha, when that unrest happened, that was called by the sheriff of Kenosha County, called the curfew in Kenosha. He did not shut down the entire Kenosha County for the protest. He narrowed the test. Every day with Kenosha- That would have been an overbroad reaction. Wauwatosa is a small community. That's correct. But also what happened in Kenosha that did not happen in Wauwatosa is that when the curfew started in Kenosha, it started at eight o'clock. Then the next day, they reevaluated and they changed the times throughout the curfew in Kenosha. That did not happen in Wauwatosa. That's one governmental unit's response to a similar public safety concern that doesn't set a legal benchmark. Your Honor, I would argue that there is, under the ward test, you need to look at whether there's any ample alternatives to communicate the message. On the very first day of this curfew, on October 7th, when Wauwatosa implemented this curfew, there was one person that was arrested. That person was driving an Uber who should have been exempt from this curfew. There was no evaluation on whether or not, okay, October 8th, can we narrowly tailor this? The law does not require that. I believe the law does require that you try to restrict as little as possible when you're restricting speech, that there should be an evaluation. The law doesn't require the least restrictive means. Correct. But it does require to evaluate the restrictive means. It does require that the municipality look at the restrictions that it's imposing on the public. And there was no explanation. There's nothing in the record why the entire city of Wauwatosa needed to be shut down for five days, 11 hours per day. There's no evaluation by the lower court as to why there weren't certain areas of Wauwatosa that people could actually protest. That happened in Kenosha County. In Kenosha County, when the officers- The comparison there, that's not the legal standard. It's objectively whether this was an appropriate response in light of the strength of the public safety interest and whether it was left open ample opportunities for the speech activity that your clients wanted to engage in. And they had all day. Your Honor, what? 13 hours of every day during that five-day period to protest. They just couldn't do it from 7 p.m. to 6 a.m. Correct, Your Honor. There's ample opportunity. Your Honor, I would push back a little bit on whether or not there was ample opportunity to protest in Wauwatosa because people could protest Monday through Friday during the day and also during the weekend. This court decided in Hodgkins, which was a curfew for children, that 11 p.m. curfew was not appropriate for children because- Hodgkins is very different because that was a permanent statewide juvenile curfew. It wasn't a five-day curfew. That's correct. That's correct. Which is very different than the facts here. That's correct. However, according to the war test, the court needs to evaluate whether there were ample alternatives for communication. And the lower court did not even evaluate that. She gave no reason for that. Why isn't the availability of the weekends and during the day on the weekends sufficient to provide, and the evenings, as Chief Judge Sykes mentioned, sufficient to provide the alternative means of expression? Well, Your Honor, just from a practical standpoint, under Hodgkins, this court noted that under the First Amendment restrictions, we presume that the speakers know, not the government, know the best what to say, how to say it, and when they want to say it. Now, with regards to this particular protest, Tracy Cole and others, they wanted to protest peacefully in the city of Wauwatosa, which was the place where her son was killed. And they wanted to convey their message that they disagreed with the district attorney's decision. And so that's why it was very important for them to protest within the city of Wauwatosa. And there was nothing in But why couldn't they do it either during the day, during the weekday, or on the weekends? Well, they could have done that as well, but why did they have to confine their protesting during that time period? According to the war test, there needs to be ample alternatives to communicate that message. And we disagree that that was an ample— You're flipping the test, though. The test isn't, why couldn't they do it, then? The test is, was there an alternative channel where they could do it? That's correct. There wasn't an alternative channel that they could do it during the protest hours, during the curfew hours. And we believe that's a problem. You know, why couldn't— So, again, so as I understand, your position is that ward requires, in the context of a curfew, ward requires that during the time that the curfew is in effect, that the government needs to provide alternative means of expression. I believe that ward requires that a government, when it's restricting any free speech, that they make an evaluation on the— They narrowly tailor the restriction of that speech, and that did not happen here. Well, the test of narrowly tailoring— I mean, we're bandying this term about, but the test is that the restriction promotes a substantial government interest that would be achieved less effectively absent the regulation, right? And so why doesn't the curfew fit the narrowly tailored test, as expressed in that way? Your Honor, it doesn't fit because there was no evaluation of this curfew. There was no reason for this curfew to be conducted in the way that it was conducted, where it was five days for 11 hours per day. There was nothing in the record to suggest why it was restricted in this way. It was planned in this way for three months on purpose, and it's not about the planning. It's about the implementation of this curfew. Why did this— Just like there was a DNC that happened here. It was expected that there would be protesting and things like that that would happen here. The city didn't shut down. The city didn't plan an emergency curfew as a result of what happened with the DNC. Because you're under war, you can't just plan curfews just because you believe people are going to protest. And I have— You have very little time left. I'd like to— A couple of other issues. Yes. I'd like to— Could I reserve? Is it okay if I— If you have something to say about your other issues, say it now. Yes. So with regards to the jury instruction, during jury deliberation, there was a question that was given by the jurors on whether or not are height, weight, eye color, and hair color considered personal information according to the Driver's Privacy Protection Act. That was an instruction that the court did not give to the jurors before deliberation. When the court came to the plaintiffs and asked both parties and asked whether or not how she should respond, we asked the court to respond to that question in the affirmative. Based on the controlling law of this court, that in fact, height, weight, eye color, and hair color are personal information according to the DPPA. The court decided not to do that and said that it was just going to focus— give them the same instruction on the personal information according to the statute, which did not have height, weight, eye color, hair color as part of that. Well, I think the rationale is that that's implicit in the statutory definition. And it's not. Height, weight, eye color, hair color are not in the statutory definition of personal information. And shortly after the court gave the jurors that misstatement of the law, they came back and voted and found against our client and it prejudiced our client. And it tainted the verdict. Do you contest that the jury instruction itself is a correct statement of the law? I contest that the jury instruction was not a correct statement of the law. And in fact, we had pro-offered our jury instruction of personal information, including the statutory definition and also including the definition of personal information, height, weight, eye color, according to Dahlstrom. But you didn't object to that instruction below? We did not. We did not object to it before the jurors came with that question that is correct. It's hard to see how it could be an abuse of discretion to refer back to a jury instruction that you hadn't objected to. Your Honor, if the jurors had not asked the question, frankly, we would not be— I don't on the law and there was an answer to that question with controlling case law from this court. The court should have answered that question in the affirmative. There was a question. And because of that, it prejudiced our client and it misguided the jury. Thank you. Thank you. May it please the court. Your Honors, this case was initiated in November of 2020. During the next 30 months, the case was extensively litigated by my law firm, as well as four law firms and four different attorneys for the plaintiffs. During that time, the court narrowed the case first through a motion to dismiss, and then through a subsequent summary judgment decision. The case proceeded to trial. The jury came back in our favor. Plaintiffs' challenges on appeal can be put into three buckets. The first is going to be the court's decision in dismissing the portion of the claims through our motion to dismiss, and that decision is at Record 190. Then we have, which was talked about extensively, the decision that the curfew satisfied the ward test and was constitutional. And then third is the jury question. I want to focus on this first issue. Now, there were several, several opportunities for plaintiffs to get it right. Now, the briefing suggests that the plaintiffs weren't provided ample opportunities to correctly plead a claim, and the record demonstrates otherwise. The first version of the complaint was filed November 20th, of November 2020. Four months later, we get a first amended complaint, a day after, we get a second amended complaint, which was untimely, filed without leave of court. Five months after that, we get a third amended complaint, again, untimely, without leave of court. A week after that, we get a notice of errata, and a corrected third amended complaint, untimely, without leave of court. And a week after that, we get a second notice of errata, and now a corrected third amended complaint, again, untimely, and without leave of court. That corrected third amended complaint was now the sixth version of this pleading. The defendants moved to strike it, and although the court did not strike the complaint, the reasoning in the decision is helpful to the analysis here. The court said, unquestionably, each of plaintiff's amended pleadings filed since March 6th have been filed outside the deadlines established by the court. The court admonished plaintiffs not to file late pleadings without leave of court, and that notices of errata do not negate the need to seek leave from the court. Now, defendants moved to dismiss the third amended complaint, and I won't, the court granted it, and I won't belabor the court with the reasoning for doing so, but I want to highlight a few portions of that decision. The court said, these fundamental errors have created a long and confusing complaint in which it is entirely unclear which plaintiffs allege which claims against which defendants. Plaintiffs will be given leave to amend the complaint. However, plaintiffs are instructed to file a organized and concise document. Further, plaintiffs are warned that the amended complaint must clarify which plaintiffs sue which defendants. And this is a part I want to focus on. Plaintiffs should consider the law on official and individual capacity claims under Section 1983 and sue accordingly. While it is true that pleading rules favor decision on the merits rather than technicalities, as the Seventh Circuit has stated, these general principles have some limits. After over a year of litigation, we still do not have an operative complaint. If plaintiffs cannot remedy these errors as articulated in the decision, they risk having the complaint dismissed with prejudice. Now, plaintiffs ignored this warning and filed a fourth amended complaint, which was actually the seventh attempt at a pleading. And I'm going to direct the court to record at 155, which is that version. It's 139 pages. It included the same deficiencies as the previous versions and additionally pursued frivolous claims for which the plaintiff's attorneys were sanctioned in the amount of $8,500 for bringing. Again, defendants moved to dismiss the fourth amended complaint. And this is where we get to plaintiff's challenge. Now, the district court necessarily dismissed plaintiff's claims against 17 individual defendants because they were named only in their individual capacities for declaratory and injunctive relief under Rule 12b-6 because that relief isn't available under Section 1983, which is something that not only defendants brought to their attention, but the court did as well. The lower court did as well. And after incoming that decision, the district court cited DJM Logistics versus FedEx, in which this court held that dismissal with prejudice of a fourth amended complaint was warranted because the amendment of the third complaint failed to comply with the district court's orders. Your honors, this was not an error. The district court's decision to dismiss claims with prejudice after they had been brought several times and after giving a clear roadmap was not an error. The second kind of procedural, I guess, issue the plaintiffs take is that they weren't able to file a fifth amended complaint, which would have actually been an eighth version of the pleading. Now, here, the district court, again, provided concrete, absolute instructions on how to properly plead their claims. The plaintiffs failed to do so in their arguments before this court kind of cast themselves as a victim from being precluded a fifth amendment, which they never sought leave to do. Once we get through these, the court narrows substantially the claims through this motion to dismiss. We move to the summary judgment, and that is where we get this first amendment curfew issue. The courts discussed it. It's briefed, but I want to point to just one of the issues that was brought up by attorney Motley, and that is this idea of alternative avenues to protest. I agree with the honors that the ward test is satisfied, and regardless of plaintiff claims that this is an unanswered question, it's not unanswered. It's been answered. The standard is objective, and plaintiffs seem to focus on this alternative channels of protesting. Wauwatosa's curfew was a five business day nighttime hour curfew that allowed them to protest people to protest a majority of the day. Why five nights? Why is five nights reasonable as opposed to three or seven or why five? Your honor, I believe that the position of the municipality when coming to a plan was trying to anticipate without having a crystal ball what the response would be. They knew, well, they had an idea of when the decision would be made and wanted to have the business days kind of covered after seeing what had happened in Kenosha, and after the third night, there is no arrest, so there's no arrest. There's one arrest made the first night. The next two nights there are is kind of when a majority of the arrest occur, and then after the third night, there are no arrests, and the curfew's not really enforced at that point. Was it lifted, or is there any evidence that they considered lifting it at that point? I'm not sure if there is, and I'll be honest, in the record whether they considered lifting the curfew at that point, but there were discussions that the kind of initial outrage or the initial concerns had subsided after the October 10th, and that's because a majority of the arrests were made on the 9th and the 10th, which I think was more of a deterrent. Counsel, I know that among the factors that Mayor McBride considered was what was happening in Kenosha and the similarities between the issues raised there, and I think in Seattle, and the raise, the issue that they anticipate might come up here, and I guess the question I posed to you is the same question I posed to Ms. Motley, which is what is the test that you propose for what can or cannot be considered? So, for example, rather than if the curfew had been issued six months after Kenosha, in the dead of winter, one would think that that is less of a justification, and so is there a particular test that you would articulate or factors that you think a court should consider in determining how imminent the threat of civil unrest needs to be? Yeah, I guess, well, the test, I think, has been established by kind of Ward in some cases after that, but I would say that I agree that if it occurred six months after the DA's decision, there would likely be an issue of whether or not it was narrowly tailored. When we're talking about imminent, law enforcement, municipalities don't have crystal balls. When we're talking about Kenosha had happened in the end of August, so we're talking within a month. Also noted in the curfew ordinance, specifically. For example, what if, hypothetically speaking, an alternative world, let's say Kenosha didn't happen, and all that the mayor had was Seattle. Would that be enough? I guess when you're saying Seattle, I'm not sure exactly what the. I guess, you know, because that's one of the municipalities he cited, right? Yeah, I believe he cites, he talks about Louisville with the Breanna Taylor situation, which had, that decision had come out on the 25th of September, which was about within a week of what, you know, our curfew. I'm not really sure about the Seattle time frame, but I think that when we're talking about this test of kind of imminency, or if there is a potential threat or potential for civil unrest. I guess I don't want to say between six months in a year would be too long. I think when we're talking about this standard, it's going to be a case by case evaluation in every in every situation. I think here, as articulated by District Court Judge Lynn Edelman in the Radke decision, the proximity and location, the proximity in time to these other neighboring municipalities does support the safety concern and this anticipation. And beyond just other municipalities, I think that something that got looked over was there was 100 days straight of protests in Wauwatosa where there, you know, whether we want to call it civil unrest or peaceful protest, I think we could differ. I think myself and Attorney Motley might disagree on what was actually occurring there. But there was a curfew put in place immediately after the killing of George Floyd, which happened in Minnesota, based off of protests that were going on in the city of Wauwatosa as well. So I think I maybe answered your question with more of a if I was creating the law, I don't think I would put a an exact time frame on it. I think there needs to be justifications. And if I think if the if the mayor would have simply said, well, we saw protests earlier in the summer in Seattle and I didn't want that to happen here, I think I think we might I think I think my opposing counsel might have a better argument. And I'm sorry, I misremembered. It was Louisville, Kentucky, was the other municipality, right? And so do I think Louisville, Kentucky, a week before when the set of circumstances was a D.A. announcement to not charge an officer would be enough? Yes. And one of these things we're talking about with and I think the court's already, you know, kind of discussed this, but the issue of plaintiffs have not demonstrated that these other alternative avenues of communication were inadequate. Basically, they're just saying that's not my first choice. We think it would have caused or we would have been able to kind of portray our outrage more if we were able to protest immediately after the D.A.'s decision. Again, word says an alternative avenue doesn't get to be your first choice or even one that provides the same audience. This kind of daytime or to the point where the argument that, well, it precluded protesting during nighttime hours and people work in nine to five. Plaintiff cites a case at Larson v. Minneapolis on page 17 of their reply brief for the position that people working full time should be able to participate. And that's a consideration to take that we should be taking into consideration when deciding whether or not a curfew is reasonable. Well, not only is Ward not precedent, Ward doesn't support that position. Ward involved a challenge to the city of Minneapolis' curfew precluding protesting in public areas from 8 p.m. to 6 p.m. following the killing of George Floyd. That case was dismissed on a motion to dismiss for failing to state a claim and the court held that the plaintiff's argument that the curfew did not leave open alternative avenues or expression lacks legal and factual support. In addressing this kind of people working during the day, the court said, judged in the context against the applicable legal standard, which is Ward, the curfew order left open alternative channels 14 hours during the day, which would leave the great majority of interested individuals, including those with full time jobs and other responsibilities, time to publicly protest. There were also two weekend days available here, correct? Yes. Um, and I think the only real difference about the case that plaintiffs rely on in Minnesota curfew and ours is that that was in May, at which time it gets dark around eight. And in our case, it was at which time it gets dark around seven. What about Ms. Motley's contention that because the mayor had planned this since July, the curfew and the scope of the curfew, that it wasn't nearly tailored to the particular circumstances at the time? I guess that argument is confusing to me when brought in context of the Ward test. I think that there were other curfews that were put in place in Wauwatosa during the  The planning and and I guess going back a little bit, there was there were times throughout the summer where the DA decision was thought to be released. I think people said it was, you know, the family was posting on social media. So at first they, when they first kind of start writing it, they're thinking it's going to come at this time. Well, then something comes up and it gets pushed back. Although we, the city had an idea of this October 7th date, there was never a for certain because the curfew was planned to be, or sorry, the DA announcement was moved a few times. So I guess to her point that it was kept, I think to the point that it was the mayor not kind of keeping it or putting it out to the Common Council also goes to the mayor's testimony that this and the resources that were being brought in that we assumed they would need. It was kept kind of under wraps because and truly when they started putting pen to paper in September after the Jacob Blake situation in Kenosha was because the governor wanted the National Guard there. And in order to have the National Guard, it's a week long process, a call out. And after seeing what had happened in Kenosha, the thought was, look, they couldn't have the National Guard there because people were burning buildings down at the time when without having leeway the seven weeks or the seven day time period to kind of do this call out. And I'm sure that the municipality in Kenosha wishes they would have had the prepared such as the city of Wauwatosa did. And so for those reasons and the reasons that are in the brief, I believe that the curfew easily satisfies the ward test. And I want to then move to this unless your honors have additional questions on the ward issue. I want to talk about very briefly about this this jury instruction issue now because it appears during oral argument that the plaintiffs have kind of conceded that they did not object to the instruction. And I think that is kind of the linchpin of the argument. We have this jury instruction and the plaintiffs in the briefs, they talk about Rule 51 and they say, we weren't provided what's required by the court in Rule 51. Well, Rule 51 doesn't require that you get to object on the record at any time to jury instructions. Rule 51 requires that the court, one, provide the parties with a draft of its instructions and two, allow the parties to object before evidence is closed and before opening statements. That happened in this jury instruction conference. And although I think it should happen at the jury instruction conference, the rule provides that it can happen any time before the close of evidence and the jury is instructed. This jury instruction conference started on May 4th. It was long. We discussed the definitions. We went through the jury instructions. And notably, the plaintiffs didn't object to the use of the statutory definition of personal information and urged the court to use the statutory definition of highly restricted personal information under the DPPA. I think the argument now that, one, we didn't have the opportunity to object is completely disingenuous and two, that the court was almost required to invite them to object to each specific portion of every jury instruction. I think the important part here is that the court never prevented them from raising any objections. Second, even if they had... The instruction was also a quote from the statute, wasn't it? Directly from the statute? Directly. And that's to my next point, is that even if they had properly objected, it's well within the court's discretion to use a statutory definition. And it's not an error to... Juries come back with questions all the time. And I would say probably 99.9% of the trials I've done, the response from the judge is, re-read the jury instruction. That's what the judge did here. And although the jury came back and asked questions about factors that were enumerated in Dahlstrom, the specific instruction, the statutory definition is actually more broad than Dahlstrom. It says, any information which identifies a person, and then gives an enumerated list like driver's license number, vehicle identification number, but would give a person of ordinary intelligence knowledge that anything that would identify individual would be covered. To my last point, even if they could demonstrate that they didn't waive the objection, and that the jury instruction improperly stated the law, which they cannot, they cannot demonstrate that it would have changed the jury's verdict. Now, height, color, weight, eye color would be considered information that identifies an individual, but so would driver's license numbers, addresses, phone numbers, vehicle identification numbers, all which were also disclosed. The plaintiffs, the jury came back and still rendered the decision that Lieutenant Roy did not knowingly disclose this information, and that's the issue I think that they're trying to appeal, not, and saying that was unfairly prejudiced them. I want to know that they make no argument as to the other defendant, Mr. Ratkowski. And that's all I have. Thank you. Ms. Motley, your time had expired, but you can have two minutes in additional time. We kept you at the podium with a lot of questions. Now, very briefly, I'd like to address what was just discussed. The standard of the award is no more restrictive than necessary, and you heard from my colleague that on October 10th, the third night of the curfew, that there was nothing that happened after that, and there was no evaluation on restricting speech further, or excuse me, restricting the curfew further on October 11th and October 12th. It's also important for this court to know that in July of this year, that the Milwaukee County Circuit Court, they deemed that the mayor had violated Wisconsin Statute 323.11. I understand that state court and basically granted summary judgment to two appellants in this matter with regards to the curfew being unlawful according to Wisconsin law. In addition to that, with regards to the curfew, planning and implementing the curfew are two different things. Now, my colleagues indicated that this curfew was premised on what happened in Kenosha. Kenosha happened on August 23rd of 2020. Before Kenosha, the mayor was well into planning. On July, in July, he met with the mayor of Milwaukee to discuss this curfew. On August 11th of 2020, he met with the National Guard, with the governor's office, and also with his police chief. And in his notes with that planning, he wrote, lead time law enforcement, not underlined, not co-family. So he disagreed with the, we believe he disagreed with the message. And there's testimony from the chief of police that the reason why he recommended the curfew is because he disagreed with the viewpoints of those that were protesting in Wauwatosa against police. And that was the reason why he recommended this curfew to Mayor McBride. In addition to this, with regards to the curfew, on October, September 30th, the mayor signed this emergency proclamation. On September 7th, the curfew began. From that time period, there's testimony that there were no emergency conditions that existed in Wauwatosa during that time period. But yet, he still implemented this curfew. There was nothing happening in Wauwatosa. And so, that's my time. I don't want to take anything further, but thank you very much. Thank you very much. Our thanks to both council. The case is taken under advisement.